UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| CHASE HELVEY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 5:19-cv-00136-GFVT-MAS |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| LEXINGTON-FAYETTE URBAN | ) | **&** |
| COUNTY GOVERNMENT, *et al.*, | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

*** *** *** ***

The Fayette County Detention Center, like many penological institutions around the United States, routinely receives and houses inmates who are addicted to drugs. Because drug withdrawal can lead to serious injury or death, a detention center's medical staff must be able to identify and appropriately respond to withdrawal symptoms in inmates. This case involves the near death of a pre-trial inmate due to severe benzodiazepine withdrawal and addresses the issue of what parties may be liable.

On March 29, 2018, Mr. Hevley was arrested and booked into the Fayette County Detention Center. Five days later, he was transported from the Detention Center to the University of Kentucky Medical Center. Upon arrival at the hospital, Mr. Helvey was admitted to the Intensive Care Unit for benzodiazepine withdrawal, which caused rhabdomyolysis and acute kidney injury.

At issue in this case is whether any of the pertinent entities, supervisors, nurses, or staff at the Detention Center were responsible for the injuries Mr. Helvey sustained due to

benzodiazepine withdrawal.  This matter is before the Court on numerous Motions for Summary Judgment filed by the Defendants.  [R. 52; R. 54; R. 55; R. 62; R. 64; R. 65; R. 66.]  For the reasons set forth herein, Defendants' motions for summary judgment will be GRANTED IN PART and DENIED IN PART.

## I

On March 29, 2018, Plaintiff Chase Helvey was arrested and booked into the Fayette County Detention Center on charges of murder, assault in the first degree, kidnapping, and tampering with physical evidence after an incident arose regarding payment to a prostitute.  [R. 52-1; R. 62-3 at 2.]  In the time leading up to Mr. Helvey's arrest, he was struggling in school and mainly doing drugs, drinking, and "living the drug addict life."  [R. 62-3 at 2.]  Mr. Helvey was also taking "anywhere from six to ten" Clonazolam (benzodiazepine) pills per day; using cocaine roughly every week; taking Adderall when doing schoolwork; and using marijuana, THC concentrate, and alcohol on a daily basis.  *Id.*

Mr. Helvey was booked into the Detention Center at 4:33 p.m.  [R. 87 at 7; R. 87-14; R. 87-15.]  Mr. Helvey informed the booking officer that he will "detox from his meds."  [R. 87-15.]  At approximately 6:51 p.m., Defendant Maryann Franco performed a mandatory mental health risk assessment of Mr. Helvey.  [R. 62-4; R. 87 at 7–8.]  During the assessment, Mr. Helvey told Ms. Franco that he abused Xanax (benzodiazepine), that he "will withdrawal" and that he had suffered a seizure two days prior.  [R. 62-4 at 2; R. 87 at 8.]  Mr. Helvey also reported that he was hospitalized less than a year ago for suicidal ideation but that this was a side effect from Zoloft.  [R. 62-4 at 2.]  Mr. Helvey also reported that he suffered from a generalized anxiety disorder and panic disorder.  *Id.*  Following her assessment and because of Mr. Helvey's

2

significant criminal charges, Ms. Franco recommended that Mr. Helvey be placed on suicide observations.  *Id.*

At approximately 7:41 p.m. Defendant Mary Theobald, APRN, conducted an intake assessment of Mr. Helvey.  [R. 62-5; R. 87 at 8.]  During the assessment, Mr. Helvey informed Ms. Theobald that he used more than thirty milligrams of benzodiazepine daily and had last used benzodiazepine earlier in the day.  [R. 62-5 at 1.]  Mr. Helvey's blood pressure was 128/78 and his pulse was 86.  *Id.*  Following the assessment, Ms. Theobald placed Mr. Helvey in Unit A, which is a specially designated unit for medical observation of patients.  [R. 62-6 at 2; R. 87 at 8.]

At approximately 10:02 p.m., Defendant Connie Miller took Mr. Helvey's vital signs, which were normal other than the slightly elevated pulse of 87.  [R. 87 at 8.]  After her evaluation, Ms. Miller entered a BWS-C (Benzodiazepine Withdrawal Score for Corrections) score of zero, though she rated Mr. Helvey's risk of withdrawal a "Level 2" and stated that he needed to be monitored every eight hours.  *Id.*  Up to this point, other than a slightly elevated pulse, Mr. Helvey's vital signs, affect, and speech were normal.[1]  *Id.*

The following morning (March 30) at approximately 8:22 a.m., a nurse entered a BWS-C score of zero but failed to take Mr. Helvey's vital signs.  [R. 87-13 at 9–10.]  At approximately 10:09 a.m., Defendant Dr. Michelle Welling visited Mr. Helvey.  *Id.* at 12.  Mr. Helvey's pulse was 119, and he complained of benzodiazepine withdrawal.  *Id.*  Dr. Welling found that Mr. Helvey had normal speech, intact memory, no sensory or motor defects, and was alert and oriented.  *Id.*  She ordered that Mr. Helvey's medical observation continue.  *Id.*

---

[1] Ms. Miller also entered a treatment note on Friday, March 30, at approximately 12:00 a.m., with instructions to "[n]otify security to observe for [withdrawal] symptoms, [e]ncourage fluids every visit[,] [p]rovide for comfort[,] [and c]ontinue to monitor for suicide risk, depression, and psychiatric co-morbidities."  [R. 87-13 at 8.]  Defendant Rhonda Feltner entered a similar note on the night of March 31.  *Id.* at 20.

Mr. Helvey's next recorded observation occurred at approximately 3:54 p.m. *Id.* at 14. Mr. Helvey's pulse had dropped to 98, his blood pressure was normal, and he again received a BWS-C score of 0. *Id.* at 15–16. About ten minutes later, social worker Tatiana Skorka conducted Mr. Helvey's suicide observation. [R. 87-20.] Mr. Helvey reported that he was "detoxing and not feeling well." *Id.* Ms. Skorka indicated that Mr. Helvey appeared to be "physically uncomfortable, but not in acute distress." *Id.* Ms. Skorka described Mr. Helvey's speech as "clear, logical, and organized," and his behavior as "goal directed." *Id.* Ms. Skorka indicated that Mr. Helvey did not display any symptoms of psychosis, mania, or self-injurious behavior. *Id.* Ms. Skorka did note, however, that Mr. Helvey's mood was depressed, his affect was constricted, and he was "intermittently tearing up but not crying." *Id.* Ms. Skorka indicated that Mr. Helvey would "continue to be monitored daily while on observation." *Id.* Ms. Miller took Mr. Helvey's vitals at approximately 10:12 p.m. [R. 87-13 at 17.] His pulse was 74 and his blood pressure was 141/90. *Id.* Mr. Helvey once again received a BWS-C score of zero. *Id.* at 18.

At approximately 1:16 p.m. the following day (March 31) Defendant Heather Lakes, a mental health worker, unsuccessfully attempted to perform the daily suicide observation on Mr. Helvey because he was sleeping "and did not wake with promps." [R. 87-21.] At approximately 2:05 p.m., Ms. Feltner took Mr. Helvey's vital signs. [R. 87-13 at 22.] Mr. Helvey's pulse was 90, his blood pressure was 142/87, and he received a BWS-C score of 1. *Id.* Mr. Helvey also complained of feeling muscle aches or stiffness. *Id.* At 2:07 p.m., Ms. Feltner entered an order for Mr. Helvey to be moved from Unit A to the general population, though Mr. Helvey ended up being moved from Unit A to Unit B to continue suicide observations. [R. 62-1 at 4; R. 87 at 11; R. 87-13 at 24.]

Over twenty hours later, on April 1 at approximately 11:28 a.m., Alexandria Carlos, a mental health worker, conducted Mr. Helvey's suicide observation. [R. 87-22.] Ms. Carlos stated that Mr. Helvey stated he was feeling "okay" and that he was trying to "stay positive." *Id.* Ms. Carolos described Mr. Helvey as "calm, cooperative and oriented to person, place and time" and stated that he had "full range of affect and his mood" was "euthymic." *Id.* Ms. Carlos described Mr. Helvey as not appearing "to be in any overt mental or physical distress." *Id.* Ms. Carolos recommended that Mr. Helvey "continue to be monitored on his current status." *Id.*

There were no reported visits to Mr. Helvey until the following evening. On April 2 at 9:06 p.m., Ms. Franco conducted a suicide observation of Mr. Helvey. [R. 62-12.] Ms. Franco noted that when Mr. Helvey was approached by officers, he simply, "wave[d] his limbs and back[ed] away." *Id.* Ms. Franco described Mr. Helvey's speech as "impoverished," though it appeared "as though he understands" what was being asked of him. *Id.* Ms. Franco ultimately stated that she was unable to assess Mr. Helvey because he was being uncooperative and she was "unable to fully assess speech and thought process for perceptual disturbance." *Id.* Ms. Franco recommended that Mr. Helvey continue to be monitored but made no other recommendations at that time. *Id.*

On the morning of April 3, mental health worker Timothy Brigmon found Mr. Helvey "lying in the floor of his cell, naked, with his head closest to the cell door" with his hands "held out at around a 90 degree angle from his body."[2] [R. 87-24.] Mr. Brigmon also noted that Mr. Helvey's hands were "visibly tremoring with some jerky movement," that his entire body was also tremoring, that he was not responding to any promptings, and could "be heard responding but his voice cannot be clearly heard." *Id.* Mr. Brigmon advised the medical staff of a possible

---

[2] Mr. Brigmon's note was entered at 12:34 p.m., but it appears from review of contemporaneous medical notes that Mr. Brigmon actually observed Mr. Brigmon in the morning of April 3.

detox. Later in the morning, Ms. Warner evaluated Mr. Helvey. [R. 74-13 at 14.] Ms. Warner was unable to take Mr. Helvey's blood pressure, but his pulse was 126. *Id.* Ms. Warner observed that Mr. Helvey was "lying in an unusual and uncomfortable appearing position and required assistance to move." *Id.* She also observed that he was keeping his "body very rigid with fine tremor noted of hands," his eyes were wide open and he was rarely blinking, his skin was pale, and he was experiencing visual and auditory hallucinations. *Id.* Ms. Warner also observed that Mr. Helvey would attempt to respond but that most of his words were not complete. *Id.* Ms. Warner assessed Mr. Helvey with Benzo detox and ordered that he be transferred back to Unit A for monitoring. *Id.*

At approximately 1:06 p.m., Defendant nurse Mary Riley evaluated Mr. Helvey. *Id.* at 17. Although she was unable to take Mr. Helvey's blood pressure "due to behavior," his pulse was still 126 and he received a BWS-C score of 15. *Id.* at 16–17. Around 2:21 p.m., Ms. Warner indicated that she had been notified by Ms. Riley that Mr. Helvey had "become diaphoretic and continue[d] with hallucinations" that included "[t]alking to the wall." [R. 87-13 at 32.] Mr. Helvey's heart rate was in the 126-130 range, though during "periods of extreme agitation" spiked as high as 180. *Id.* Mr. Helvey was also described as having his body in an extended stance, his shirt was wet with sweat, and he was very pale. *Id.* Nurse Riley called a Code on Mr. Helvey, which required transportation to the University of Kentucky Emergency Department. [R. 62-17.]

Approximately twenty-two minutes later, Mr. Helvey arrived at the hospital where he was admitted. Upon arrival, Mr. Helvey "appeared to be lethargic and was having tremors." [R. 74-23 at 9.] A doctor evaluated Mr. Helvey upon admission and reported that he had "acute kidney injury and…needs to be seen emergently." *Id.* at 16. At the hospital, a doctor told Mr.

Helvey that he was lucky to be alive. [R. 74-4 at 50.] Mr. Helvey was diagnosed with benzodiazepine withdrawal and was treated for an acute kidney injury, rhabdomyolysis, and pneumomediastinum. [R. 62-19.] Over the next several days, the University of Kentucky Medical Center treated Mr. Helvey, and he was discharged back to the Detention Center approximately one week after being admitted. *Id.* Mr. Helvey alleges that he still suffers from "lingering joint issues from seizures or tremors in the Jail, right hip and left shoulder problems, a nervous twitch, a lack of concentration, and neurological issues." [R. 87 at 16.]

## II

### A

Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party bears the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477

U.S. at 324).

The Court then must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251–52). In making this determination, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). "Where, as here, the Court is simultaneously considering multiple motions for summary judgment, the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F. Supp. 2d 280, 291 (S.D.N.Y. 2009) (citing *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008)).

**B**

Mr. Helvey brought the following seven counts in his Complaint: (1) objective unreasonableness pursuant to 42 U.S.C. § 1983 against the Medical Defendants[3]; (2) deliberate indifference pursuant to 42 U.S.C. § 1983 against the Medical Defendants; (3) supervisory liability pursuant to 42 U.S.C. § 1983 against defendants Steve Haney, Michelle Welling, and Patricia Warner; (4) *Monell* liability pursuant to 42 U.S.C. § 1983 against defendants Lexington-Fayette Urban County Government, Steve Haney, Corizon Health, Inc., and Corizon, LLC; (5) negligence/gross negligence against the Medical Defendants; (6) negligence/gross negligence against defendants Steve Haney, Corizon Health, Inc., and Corizon, LLC; and (7) respondeat

---

[3] The "Medical Defendants" refers to Defendants Michelle Welling, Patricia Warner, Connie Miller, Maryann Franco, Mary Theobald, Rhonda Feltner, Mary Riley, and Heather Lakes. [R. 1 at 8.]

superior liability against defendants Corizon Health, Inc. and Corizon, LLC.  [R. 1 at 12–17.]  The Defendants have filed seven motions for summary judgment or partial motions for summary judgment in this case.  [R. 52; R. 54; R. 55; R. 62; R. 64; R. 65; R. 66.]  The Court will now address the arguments made by the parties as to each count in the Complaint.[4]

## 1

Mr. Helvey brought the first two counts of his Complaint, objective unreasonableness and deliberate indifference, against Michelle Welling, Patricia Warner, Connie Miller, Maryann Franco, Mary Theobald, Rhonda Feltner, Mary Riley, and Heather Lakes[5] (the Medical Defendants).  [R. 1 at 8.]  These counts are related and touch on an issue the Sixth Circuit just recently addressed: what is the proper standard to apply to pretrial detainees who bring claims of constitutionally inadequate medical care?

It is well established that prisoners must bring claims of inadequate medical care under the Eighth Amendment's prohibition of cruel and unusual punishment.  *See Estelle v. Gamble*, 429 U.S. 97, 101 (1976).  In determining whether inadequate medical care was provided to a prisoner, courts apply a two-part test that includes both an objective and a subjective component.  *Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).  "The objective component requires the existence of a sufficiently serious medical need."  *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "[O]bjective reasonableness turns on the facts and circumstances of each particular case."  *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  The subjective component

---

[4] Count seven, respondeat superior against Defendant Corizon Health, Inc. and Corizon, LLC, was not at issue in any of the parties' motions for summary judgment and therefore will not be addressed in this opinion and order.  To the extent that Corizon Health, Inc., and Corizon, LLC request dismissal of "all claims against them," that request will be denied as to the respondeat superior count.

[5] After conducting discovery, Mr. Helvey chose to abandon all claims against Ms. Lakes and did not respond to her motion for summary judgment.  [R. 74 at 1.]  Therefore, Ms. Lakes' motion for summary judgment will be granted.  *See Benitez v. Tyson Fresh Meats, Inc.*, 2022 WL 58399, at *12 n.36 (M.D. Tenn. Jan. 5, 2022) (collecting cases for the proposition that courts "regularly grant summary judgment on abandoned claims"); s*ee also Morris v. City of Memphis*, 2012 WL 3727149, at *2 (W.D. Tenn. Aug. 27, 2012) (same).

requires "an inmate to show that prison officials have a sufficiently culpable state of mind in denying medical care. *Jones*, 625 F.3d at 941 (quoting *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004)).  The Supreme Court has held that "[o]fficials have a sufficiently culpable state of mind where officials act with deliberate indifference to a serious medical need." *Id.* (quoting *Farmer*, 511 U.S. at 834).  However, because pretrial detainees like Mr. Helvey do not fall under the protection provided by the Eighth Amendment, their claims are instead analyzed under the Due Process Clause of the Fourteenth Amendment.  *Bowles v. Bourbon Cnty., Ky.*, 2021 WL 3028128, at *6 (6th Cir. July 19, 2021) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

Historically, courts have "analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Id.* (quoting *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018); *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002) ("Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases.") (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  However, in *Kingsley v. Hendrickson*, the Supreme Court "rejected the practice of analyzing claims by prisoners and pretrial detainees under the same standard," finding that pretrial detainees who allege excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Bowles*, 2021 WL 3028128, at *7 (quoting *Kingsley*, 576 U.S. at 396–97).

*Kingsley* applied specifically to claims of excessive force, and for six years the Sixth Circuit did "not squarely resolve[] whether the objective-unreasonableness test of *Kingsley* extends to claims by pretrial detainees of constitutionally inadequate medical care." *Id.*  Each

time the question came up, the Sixth Circuit "found it unnecessary to answer the question…because the same result would obtain under either the subjective test dictated by *Farmer* or by a purely objective test derived from *Kingsley*." *Id.* (collecting cases).

However, in September 2021, the Sixth Circuit addressed *Kingsley*'s applicability to claims of constitutionally inadequate medical care and held that *Kingsley* required "modification of the subjective prong of the deliberate-indifference test for pretrial detainees." *Brawner v. Scott Cnty., Tenn.*, 14 4th 585, 596 (6th Cir. 2021). "*Brawner* modified the second prong of the deliberate indifference test applied to pretrial detainees to require only recklessness." *Greene v. Crawford Cnty., Mich.*, --- 4th ----, 2022 WL 34785, at *8 (6th Cir. Jan. 4, 2022) (quoting *Brawner*, 14 F.4th at 597).

Following *Brawner*, for Mr. Helvey to survive summary judgment on a deliberate indifference claim, he must

> present evidence from which a reasonable jury could find that (1) [] [Mr. Helvey] had an objectively serious medical need; and (2) [] [the defendants'] action (or lack of action) was intentional (not accidental) and [the defendants] either (a) acted intentionally to ignore [Mr. Helvey's] serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Mr. Helvey.]

*Greene*, --- 4th ----, 2022 WL 34785, at *8 (quoting *Brawner*, 14 F.4th at 597). Therefore, Mr. Helvey's count for objective unreasonableness does not stand alone, but rather is an element within count two's deliberate indifference analysis. *Charles v. Lee Cnty., Ky.*, 2020 WL 6430322, at *2 (E.D. Ky. Nov. 2, 2020) ("Sixth Circuit precedent does not recognize an independent cause of action for 'objective unreasonableness' under the Fourteenth Amendment").

An objectively serious medical need is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the

necessity for a doctor's attention." *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 567 (6th Cir. 2020) (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).  The parties dispute whether Mr. Helvey had an objectively serious medical need.  Defendants Warner, Theobald, Miller, Feltner, and Riley argue that Mr. Helvey cannot satisfy the objectively serious medical need standard because "he cannot show that the alleged conditions of incarceration posed 'a substantial risk of serious harm' until approximately 2:21 p.m. on April 3, 2018," at which point he was taken to the hospital.  [R. 62-1 at 7–8.]  In response, Mr. Helvey argues that his benzodiazepine withdrawal symptoms constituted a serious medical need.  [R. 87 at 18.]

The Sixth Circuit has previously found that withdrawal symptoms following a strong addiction to benzodiazepine constitute a serious medical need.  *See French v. Daviess Cnty, Ky.*, 376 F. App'x 519, 522 (6th Cir. 2010) (assuming "that French had a serious medical condition arising out of his apparently strong addiction to Xanax").  Here, Mr. Helvey indicated to the Detention Center medical staff that he used more than thirty milligrams of benzodiazepine daily, including the day he was booked into the Detention Center.  [R. 62-5 at 1; R. 87 at 8.]  Furthermore, the day before he was taken to the hospital, Defendant Franco found Mr. Helvey "hallucinating and unable to speak coherently" and he experienced other more minor withdrawal symptoms in the days leading up to his hospitalization.  [R. 87 at 12.]  Given the medical staff's knowledge of Mr. Helvey's significant benzodiazepine use prior to being booked at the Detention Center, combined with the withdrawal symptoms he exhibited over the course of multiple days prior to being taken to the hospital, the Court finds that Mr. Helvey had a serious medical need arising out of his addiction to benzodiazepine.

There is no dispute that the actions (or lack thereof) taken by the staff at the Detention Center were intentional and not accidental.  The question here is whether the Medical

12

Defendants "acted intentionally to ignore [Mr. Helvey's] serious medical need," or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Mr. Helvey.]" *Greene*, --- 4th ----, 2022 WL 34785, at *8. "[T]he subjective component of a deliberate indifference claim must be addressed for each officer individually." *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 542 (6th Cir. 2008)). The Defendants generally argue that summary judgment is appropriate in this case because there is no evidence "that any Corizon employee was in fact deliberately indifferent to a serous medical need presented by Mr. Helvey." [R. 62-1 at 6.]

a

Mr. Helvey argues that Defendant Welling "acted unreasonably" during her evaluation and subsequent treatment of him on March 30. [R. 87 at 21.] Specifically, Mr. Helvey takes issue with the fact that Dr. Welling determined during her March 30 evaluation that Mr. Helvey had an elevated pulse and was experiencing "benzo withdrawal" but did not prescribe him with benzodiazepine. [R. 87.] Mr. Helvey also argues generally that Dr. Welling failed to provide him with benzodiazepines before his symptoms became severe. [R. 87 at 30.]

Given Mr. Helvey's serious benzodiazepine use prior to being booked into the Detention Center, Dr. Welling's knowledge of his prior benzodiazepine use, and his elevated pulse, there is a genuine issue of material fact as to whether Dr. Welling acted recklessly in not treating Mr. Helvey with benzodiazepine. Mr. Helvey's expert opined that given Mr. Helvey's history of drug use and elevated blood pressure and pulse, Mr. Helvey should have "been given a benzodiazepine…to prevent progression to a more severe withdrawal symptom." [R. 21-1 at 4.] Therefore, a jury question exists as to whether Dr. Welling violated Mr. Helvey's constitutional rights. *See Brawner*, 14 F.4th at 598 (finding an issue of material fact where nurse "abruptly

13

discontinue[d]" plaintiff's use of suboxone, clonazepam, and gabapentin upon admittance to the jail).

Mr. Helvey also argues that Dr. Welling acted unreasonably by ending Mr. Helvey's detox observations early.  [R. 87 at 23.]  Although Defendant Feltner entered the order ending Mr. Helvey's detox observations, the order stated that Dr. Welling requested it, which Dr. Welling disputes.  [R. 87 at 23–24.]  Mr. Helvey's expert states that the order to transfer Mr. Helvey to the general population[6] occurred "about the same time one would expect the benzodiazepine withdrawal syndrome to peak."  [R. 21-1 at 4.]  Therefore, an issue of material fact remains as to whether the act of ending Mr. Helvey's detox observation "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Mr. Helvey.]"  *Greene*, ---4th ----, 2022 WL 34785, at *8.  Accordingly, the court denies Dr. Welling's motion for summary judgment as to the deliberate indifference claim.

**b**

Mr. Helvey argues that Ms. Warner acted unreasonably by (1) ending Mr. Helvey's detox observations early; (2) failing to transfer Mr. Helvey to an acute care facility on April 3; and (3) not providing him with benzodiazepines despite the risk that he could develop serious withdrawal symptoms.  [R. 87 at 23, 25, 30.]  As discussed above, although the order ending Mr. Helvey's detox observations states that it was requested by Dr. Welling, Dr. Welling states that because the order was entered on a Saturday, it must have been entered by Ms. Warner.  *Id.* at 24.  For the same reasons articulated for Dr. Welling above, because Ms. Warner may have ordered the termination of Mr. Helvey's detox observations, there is a genuine issue of material fact as to whether Ms. Warner "recklessly failed to act reasonably to mitigate the risk the serious

---

[6] Because of his suicide observation, Mr. Helvey ended up moving to Unit B instead of the general population.  [R. 87-22.]

14

medical need posed to [Mr. Helvey.]"  *Greene*, --- 4th ----, 2022 WL 34785, at *8.

Furthermore, there is a question as to whether it was reckless of Ms. Warner not to send Mr. Helvey to the hospital after evaluating him on April 3.  On the morning of April 3, a mental health worker found Mr. Helvey "lying in the floor of his cell, naked, with his head closest to the cell door" with his hands "held out at around a 90 degree angle from his body."  [R. 87-24.]  Ms. Warner subsequently evaluated Mr. Helvey and made the following observations: (1) his pulse was 126; (2) he was "lying in an unusual and uncomfortable appearing position and required assistance to move;" (3) he was keeping his "body very rigid with fine tremor noted of hands;" (4) his eyes were open wide and he was rarely blinking; (5) his skin was pale; (6) he was experiencing visual and auditory hallucinations; and (6) when he attempted to speak, most of his words were not complete.  [R. 74-13 at 14.]  However, instead of sending Mr. Helvey to the hospital, she returned Mr. Helvey to Unit A for closer monitoring.  *Id.*  Given the seriousness of the symptoms exhibited by Mr. Helvey, there is a factual dispute as to whether Ms. Warner's decision to send Mr. Helvey back to Unit A for closer monitoring instead of to the hospital was reckless.  Finally, for the same reasons articulated for Dr. Welling supra, a jury question remains as to whether Ms. Warner acted recklessly in not treating Mr. Helvey's withdrawal with benzodiazepine at the Detention Center.  Accordingly, the motion for summary judgment will be denied as to Ms. Welling for the deliberate indifference count.

### c

Mr. Helvey argues that Ms. Miller acted unreasonably by relying on jail officers to conduct detox observations.[7]  [R. 87 at 28.]  Specifically, Mr. Helvey states that Ms. Miller entered an order "instructing officers to observe for withdrawal symptoms."  *Id.*  While the

---

[7] Mr. Helvey made this contention against "every individual defendant."  [R. 87 at 28.]  However, the analysis here applies with equal force to the other defendants.

record indicates there may have been a breakdown in communication between officers and medical staff [*see* R. 8 at 6], the Court finds that the act of entering an order instructing officers to observe Mr. Helvey for withdrawal symptoms (in addition to, not in replacement of, care he received from medical personnel) does not rise to the level of reckless disregard for a serious medical need. In fact, if anything, it indicates a desire by Nurse Miller to have additional eyes on Mr. Helvey to increase his level of care. Therefore, the motion for summary judgment will be granted as to Defendant Miller.

**d**

Mr. Helvey's primary contention with Ms. Franco is that she had a duty to communicate her observations of Mr. Helvey's behavior to medical staff but failed to do so. [R. 74 at 15.] Ms. Franco observed Mr. Helvey in a state in which he "wave[d] his limbs and back[ed] away" and his speech was "impoverished," but she did not report her observations to anyone on the medical staff, other than noting the encounter in her chart. [R. 62-12.] Ms. Franco argues her alleged failure to notify a member of the medical staff does not even rise to the level of negligence [*see* R. 55], which is below the deliberate indifference standard. *See Winkler*, 893 F.3d at 891 ("in order to show deliberate indifference, a plaintiff must allege more than negligence") (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

*Bowles* is instructive. In *Bowles*, a prisoner complained of "serious headaches" for days before his death, but the staff attributed the complaints to a sinus infection and drug withdrawal symptoms and delayed taking the prisoner to the hospital. 2021 WL 3028128, at *1. The coroner determined the cause of death to be a "Right Temporoparietal Mass due to Chronic IV Drug Abuse." *Id.* The Sixth Circuit found that the care given by Defendant Cox-Lynn when she "failed to take all vital signs during her examinations of Bowles, failed to monitor Bowles

16

closely upon his return from the initial hospital visit, and failed to put Bowles on a list of patients to be examined" did not rise above negligence. *Id.* at *8. Furthermore, although Defendant Cox-Lynn failed to inform the APRN on call about the defendant's "reported nausea and vomiting along with a headache," the Court still found that her conduct did not rise above negligence. *Id.* Here the Court finds that Ms. Franco's conduct in not communicating her observations to medical staff, other than noting her encounter in her chart, did not rise to the level of recklessness and summary judgment will be granted to her on this count.

### e

Mr. Helvey's criticisms of Defendant Mary Theobald, a nurse at the detention center, are general. Mr. Helvey argues that "every individual defendant," Ms. Theobald included, "acted unreasonably when they relied on Jail officers to conduct detox observations" and that Ms. Theobald was one of several individuals who "fail[ed] to conduct a urine dipstick toxicology" after one was ordered by Defendant Warner. [R. 87 at 27–28, 40.] However, Mr. Helvey never attempts to argue that Ms. Theobald specifically relied on jail officers to conduct detox observations or that it was Nurse Theobald's responsibility to conduct Mr. Helvey's urine dipstick toxicology. Furthermore, taking the facts as provided by Mr. Helvey, Ms. Theobald conducted a thorough assessment of Mr. Helvey and "entered standing orders for Tylenol and Tums," and "sent Helvey to Unit A for detox observations" given his "high risk factor for withdrawal." [R. 87 at 8.] Accordingly, because there is nothing in the record indicating that Ms. Theobald intentionally ignored a serious medical need or "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Mr. Helvey]," summary judgment will be granted as to Ms. Theobald. *Greene*, --- 4th ----, 2022 WL 34785, at *8.

**f**

Mr. Helvey's primary argument against Defendant Feltner is that she "entered the order ending Helvey's detox observations over 50 hours before they were scheduled to expire." [R. 87 at 23.] The facts are unclear as to whether the order was requested by Dr. Welling, Ms. Warner, or if Ms. Feltner did it on her own.[8] Given Ms. Feltner's knowledge of Mr. Helvey's detox and the symptoms he was already experiencing (including elevated pulse, high blood pressure, and muscle aches), there is an issue of material fact as to whether Ms. Feltner's entering of the order ending Mr. Helvey's detox observations "recklessly failed to act reasonably to mitigate the risk the serious medical need posed to [Mr. Helvey]." *Greene*, --- 4th ----, 2022 WL 34785, at *8. Accordingly, summary judgment will be denied as to Ms. Feltner.

**g**

Mr. Helvey's primary argument against Defendant Mary Riley is that she failed to transfer him to the hospital quickly enough on April 3. [R. 87 at 25.] The records indicate that after Mr. Helvey was moved back to Unit A for closer monitoring, Ms. Riley saw him at 1:06 p.m. [R. 87 at 27.] Ms. Riley documented her visit with Mr. Helvey and notified the provider (either Dr. Welling or Ms. Warner) about her visit. *Id.* The records do not indicate whether either Dr. Welling or Ms. Warner responded. Approximately one hour and fifteen minutes later, Ms. Riley again visited Mr. Helvey and called a Code, at which time Mr. Helvey was transported to the hospital. Viewing the facts most favorable to the Plaintiff, the Court assumes that Ms. Riley failed to follow up on her communication to Dr. Welling or Ms. Warner. Furthermore, Ms. Riley allowed an hour and fifteen minutes to pass between her first visit with Mr. Helvey on April 3 and eventually calling a Code to have Mr. Helvey taken to the hospital. While failing to

---

[8] The order states that Dr. Welling requested that Mr. Helvey's detox observations end, but she denies this. [R. 87 at 23–24.]

follow up with Dr. Welling or Ms. Warner and waiting more than an hour in light of such serious symptoms may have been negligent on Ms. Riley's part, they do not rise to the requisite level of recklessness. *Bowles*, 2021 WL 3028128, at *8–9 (finding that nurse who failed to communicate nausea, vomiting, and headache symptoms to her supervisor and delayed two hours in sending plaintiff to the hospital was not more than negligent). Therefore, summary judgment is granted on this count as to Nurse Riley.

### 2

Mr. Helvey's third claim is for supervisory liability against Defendant Steve Haney.[9] [R. 1 at 13.] For supervisory liability to attach under § 1983, a supervisor must do more than merely fail to act—he must "actively engage[] in unconstitutional behavior." *Jones v. Clark Cnty., Ky.*, 959 F.3d 748, 761 (6th Cir. 2020). Furthermore, "liability must lie upon more than a mere right to control employees and cannot rely on simple negligence." *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir. 2006). "A supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Jones*, 959 F.3d at 761 (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

Defendant Haney argues that summary judgment should be granted as to this count because he cannot be held liable under § 1983 as a supervisor because there is no evidence that he "encouraged, authorized, or participated in his medical care at the jail." [R. 52 at 5.] Specially, Defendant Haney argues that (1) Mr. Helvey has presented no evidence that Defendant Haney had "any direct involvement in the medical treatment" provided to Mr. Helvey during his incarceration; (2) Defendant Haney testified that he "had no interaction" with Mr.

---

[9] Mr. Helvey originally pled supervisory liability claims against Defendants Dr. Welling and Ms. Warner, but after discovery abandoned those claims. [R. 87 at 50.]

Helvey, and (3) Mr. Helvey "agreed that he had had no contact with Director Haney." *Id.* The Court finds Defendant Haney's argument persuasive. Nothing in the record indicates that he either encouraged or directly participated in any misconduct. *Jones*, 959 F.3d at 761.

In addition, Mr. Helvey failed to respond to Defendant Haney's supervisor liability argument and therefore abandoned it. *Cf. Campbell v. Hines*, 2013 WL 7899224, at *4 (6th Cir. Aug. 8, 2013) (affirming district court's declination to address merits of plaintiff's equal protection claim because plaintiff failed to respond to defendants' argument that they were entitled to qualified immunity); *Conner v. Hardee's Food Systems, Inc.*, 65 F. App'x 19, 24 (6th Cir. 2003) (finding argument abandoned where plaintiff failed to respond to issue raised in defendant's motion for summary judgment). Accordingly, the Court will grant summary judgment as to Mr. Helvey's third claim is for supervisory liability against Defendant Haney.

**3**

Mr. Helvey's fourth count is *Monell* liability against Defendants Lexington-Fayette Urban County Government, Haney, Corizon Health, Inc., and Corizon, LLC.[10] [R. 1 at 14.] *Monell v. Dep't of Soc. Servs. of City of New York* stands for the proposition that a local government body may "be sued directly under § 1983 where the allegedly unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. 658, 690 (1978). Furthermore, a government body "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91.

---

[10] *Monell* liability only applies to local governmental units and not to individual actors. *Smith v. Cnty. of Santa Cruz*, 2014 WL 3615492, at *11 (N.D. Cal. July 22, 2014); *Atkinson v. New York State Olympic Reg'l Dev. Auth.*, 822 F. Supp. 2d 182, 191 (N.D.N.Y. 2011); *Guillory v. Orange Cnty.*, 731 F.2d 1379, 1382 (9th Cir. 1984). Therefore, the Court grants Director Haney's motion for summary judgment as to this count on that basis.

In the Complaint, Mr. Helvey argues that Defendants Lexington-Fayette Urban County Government, Haney, Corizon Health, Inc., and Corizon, LLC (1) failed to adequately train, supervise, or discipline their employees and independent contractors, which amounted to deliberate indifference; and (2) had a policy to refuse to provide Detention Center inmates with benzodiazepine, even if medically appropriate, amounting to deliberate indifference. [R. 1 at 14–15.] Mr. Helvey does not argue that the identified policies or actions were unlawful, just that the parties acted with deliberate indifference. *Id.* "Where the identified policy is itself facially lawful, the plaintiff 'must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Winkler*, 893 F.3d at 901. There are two primary ways in which a failure to train or supervise may ultimately be found to constitute deliberate indifference: (1) "a plaintiff can demonstrate deliberate indifference by showing that the municipality has failed to act in response to repeated complaints of constitutional violations by its officers;" and (2) "in a narrow range of circumstances, a plaintiff can show that a municipality was deliberately indifferent by fail[ing] to equip law enforcement officers with specific tools to handle recurring situations." *Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 287 (6th Cir. 2020) (citations omitted).

Under the first approach, "a plaintiff must show that the defendant was aware of prior instances of unconstitutional conduct such that it was clearly on notice that the training in this particular area was deficient and likely to cause injury and yet ignored a history of abuse." *Id.* (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Because Mr. Helvey has failed to provide examples of prior instances where inmates received constitutionally inadequate

healthcare at the Detention Center, the first situation is not at issue in this case. *See Winkler*, 893 F.3d at 903.

The second approach applies "in a narrow range of circumstances." *Id.* The Supreme Court has instructed that a defendant may be held liable if, "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

### a

Mr. Helvey argues that Defendant Lexington-Fayette Urban County Government (1) had no written policies or training specific to withdrawal symptoms; (2) failed to adequately train its officers on Kentucky Jail Standards pertaining to documented observations; and (3) this conduct was "a moving force" behind Mr. Helvey's injuries. [R. 82 at 14–17.] To prevail on a claim based on inadequate training of jail personnel, Mr. Helvey "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler*, 893 F.3d at 902 (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

*Winkler* is instructive. In *Winkler*, the plaintiff argued that the county acted with deliberate indifference by failing to provide the jailers with medical training other than basic first aid and CPR. *Id.* at 903. The Sixth Circuit disagreed, finding that because the plaintiff had access to medical care through the jail's medical staff "either in person or by phone," there was

"no basis to conclude that the County exhibited deliberate indifference by failing to provide additional medical training to jail personnel." *Id.* (citing *Harris*, 489 U.S. at 391).

The same is true of Mr. Helvey's situation. Detention Center policy required officers to contact medical staff "as quickly as possible" if an inmate was injured or had an illness that required immediate attention. [R. 82-3 at 2.] Officers received extensive training when they were hired, including general medical training. [R. 82-2 at 6.] Mr. Helvey has not identified what additional training the officers should have received other than general "training on withdrawal symptoms." [R. 82 at 15.] Mr. Helvey also has not explained how additional training on the part of the officers would have changed the outcome in this case, and he therefore has not demonstrated causation. *Griffith*, 975 F.3d at 584 ("Because nothing in the record suggests that the deputy jailers would have done anything other than report to Nurses Trivette and Sherrow, both of whom evaluated Griffith multiple times during his detox period, he cannot demonstrate causation.") Furthermore, just like the plaintiff in *Winkler*, Mr. Helvey had access to the Detention Center's medical team, and he was routinely evaluated by nurses and other medical professionals. *Winkler*, 893 F.3d at 902. Even if Mr. Helvey could show that the Detention Center's "training of its jail personnel was inadequate, []he presented no proof to show that this inadequacy resulted from deliberate indifference." *Id.* at 902. The same is true of the jail officers' failure to document their surveillance of Mr. Helvey every twenty minutes. Even though the officers' failure to document their visits to Mr. Helvey every twenty minutes may constitute negligent behavior, there is no evidence that this "was the result of the municipality's deliberate indifference." *Id.* at 902.

Mr. Helvey also argued in his Complaint that Defendant Lexington-Fayette Urban County Government had a policy of refusing "to provide benzodiazepines to Detention Center

inmates, even when medically appropriate." [R. 1 at 15.] However, during discovery, Mr. Helvey admitted that "he was unaware of any written policy regarding the prescribing of benzodiazepine," which is understandable because, as Defendant Lexington-Fayette Urban County Government points out, no such a policy exists. [R. 52 at 7–8.] Ms. Warner testified that medical staff at the Detention Center had prescribed benzodiazepines for benzodiazepine withdrawal and that while working at the Detention Center she had personally prescribed benzodiazepines to inmates suffering from withdrawal. [R. 52-6 at 4.] Furthermore, Mr. Helvey abandoned the argument that no such policy existed by failing to respond. *Conner*, 65 F. App'x at 24 (finding argument abandoned where plaintiff failed to respond to issue raised in defendant's motion for summary judgment). Therefore, the motion for summary judgment as to the *Monell* liability claim for the Lexington-Fayette Urban County Government will be granted.

**b**

Defendants Mr. Haney and Lexington-Fayette Urban County Government have provided an additional reason to grant the motion for summary judgment as to both the supervisory liability and *Monell* liability claims against them. The Prison Litigation Reform Act provides that a prisoner confined in a correctional facility may not bring a suit "under section 1983 of this title, or any other Federal law," without first exhausting "such administrative remedies as are available." 42 U.S.C. § 1997e(a). Exhaustion is a "mandatory threshold requirement in prison litigation." *Brown v. Morgan*, 209 F.3d 595, 596 (6th Cir. 2000); *see also Gilmore v. Ormond*, 2019 WL 8222518, at *1 (6th Cir. Oct. 4, 2019) (citing *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015)). Although exhaustion is mandatory, there are three circumstances in which an administrative remedy is not possible: (1) an administrative procedure that "operates as a simple dead end" because officers are "unable or constantly unwilling to provide any relief to aggrieved

24

inmates;" (2) an administrative regime that is so opaque that it is practically incapable of use; and (3) a procedure in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

The term "available" in the PLRA context means that a prison must exhaust "only those procedures that he is reasonably capable of exhausting." *Braswell v. Corrections Corp. of Am.*, 419 F. App'x 622, 625 (6th Cir. 2011); *see also Lewis v. Decker*, 2020 WL 5984757, at *1 (6th Cir. July 14, 2020) (finding that an inmate "need not exhaust unavailable remedies") (citing *Does 8-10 v. Snyder*, 945 F.3d 951, 962 (6th Cir. 2019)). "Exhaustion of such administrative remedies must be in accordance with the procedures established by law and the authorities operating the facility confining the prisoner." *Basham v. Hart*, 2021 WL 5767729, at *1 (6th Cir. Aug. 31, 2021) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). The failure to exhaust administrative remedies "is an affirmative defense that the defendant must demonstrate." *Id.* (citing *Napier v. Laurel Cnty.*, 636 F.3d 218, 225 (6th Cir. 2011)).

The County Government and Haney Defendants argue that Mr. Helvey failed to exhaust his administrative remedies. [R. 52 at 3.] They specifically point to the Lexington Fayette Urban County Government Policy and Procedure Manual that specifies "any inmate in detention" may file a grievance within seven days alleging a violation of a constitutional right, statutory right, Policy right, criminal act by a staff member, an act by staff that violates Policy, Procedure, or OpOrders, or an unsafe or unsanitary condition in the living area. [R. 52-3 at 2.] The County Government and Haney Defendants argue that no grievance regarding the matters at issue in this case was filed by Mr. Helvey, and therefore the claims against them must be dismissed for failure to exhaust. [R. 52 at 4.]

25

In response, Mr. Helvey argues that the County Government and Haney Defendants failed to meet their burden that Mr. Helvey did not exhaust his administrative remedies.  [R. 82 at 9–12.]  Mr. Helvey relies on *Braswell v. Corrections Corp. of Am.* for the proposition that defendants must prove that (1) a prisoner in a deteriorating condition knows he needs mental health treatment or knows that he needs to communicate that need to prison officials; (2) the prisoner is capable of filing a grievance given his mental status; and (3) that the prisoner sufficiently understood the facility's grievance procedures. *Id.* at 11 (citing 419 F. App'x 622, 625 (6th Cir. 2011)).  Here, Mr. Helvey argues that the County Government and Haney defendants failed to meet those three factors in this case.  *Id.* at 11–12.

Mr. Helvey's arguments fail for several reasons.  First, this case is distinguishable from *Braswell*.  In *Braswell*, a prisoner, who was later diagnosed with schizophrenia, did not leave his cell for a period of nine consecutive months and the officers stopped trying to force him to leave his cell.  419 F. App'x at 624.  The prisoner's conservator filed a claim alleging arguing that his constitutional rights had been violated by the facility and its employees, and the defendants argued that the prisoner had failed to exhaust his administrative remedies.  *Id.*  The Sixth Circuit found that the defendants had failed to demonstrate beyond dispute that administrative remedies were available to the prisoner.  *Id.* at 625–26.  Here, in contrast to a situation lasting nine months, Mr. Helvey suffered acute withdrawal symptoms for a matter of days, before and after which he was mentally stable and capable of filing a grievance.  [*See generally* R. 62-19; R. 87-22.]

Additionally, the *Braswell* factors do not favor Mr. Helvey.  First, while Mr. Helvey may not have had the mental capacity to file a grievance form on April 2 or April 3, the Grievance Procedure indicates that "[a]ny inmate may file an inmate grievance form, within seven days, to

26

bring a situation to the attention of the staff." [R. 52-3.] While this section is not completely clear as to when exactly the seven-day clock starts, it is reasonable to infer that the situation at issue here continued until Mr. Helvey returned to the Detention Center from the hospital. *See Pines v. Dyer*, 2013 WL 2242351, at *5 (E.D. Mich. May 21, 2013) ("Physical or mental infirmities may render administrative remedies 'unavailable,' and excuse a prisoner from complying with the PLRA's exhaustion requirement.") (quoting *Michalek v. Lunsford*, 2012 WL 1454162, at *3 (E.D. Ark. Apr. 5, 2012)). Inmate Services is required to "make inmate grievance forms available to any inmate, upon request," and there is no evidence in the record that Mr. Helvey attempted to request a form from Inmate Services once he had returned to the detention facility. *Id.*

As to the second factor, Mr. Helvey subsequently filed a Grievance Report regarding a separate issue that occurred in June 2018. [R. 52-4.] This fact demonstrates both that the opportunity to submit a grievance was available to Mr. Helvey, and that he was capable of filing a grievance.[11] Mr. Helvey's recovery and the fact that he subsequently submitted an unrelated grievance also cut against the third *Braswell* factor, which addresses whether a prisoner sufficiently understands a facility's grievance procedures. The fact that Mr. Helvey successfully filed a grievance in June 2018 demonstrates that he understood the facility's grievance procedures.

Finally, Mr. Helvey does not attempt to argue that the officers were unable or unwilling to assist aggrieved inmates, that the administrative regime was so confusing it was essentially impossible to navigate, or that the prison administrators attempted to thwart Mr. Helvey in his

---

[11] Although this grievance was filed two months after the facts giving rise to this case, the submitted grievance still supports the proposition that Mr. Helvey was mentally capable of following the Detention Facility's grievance procedures.

attempt to use the grievance process.  *See Ross*, 578 U.S. at 643–44.  While the Court is sympathetic to the circumstances surrounding Mr. Helvey's hospitalization, the Supreme Court has made it clear that exhaustion is mandatory, despite how compelling certain "special circumstances" might appear.  *Id.* at 640.  Accordingly, the Court finds that Mr. Helvey failed to exhaust his administrative remedies.[12]

c

Mr. Helvey argues that the Corizon defendants (1) failed to provide training on withdrawal, and (2) the lack of training was a moving force behind Mr. Helvey's injuries.  [R. 87 at 46–47.]  Although Corizon is a private company, private medical companies who contract with jails can be held liable under *Monell*.  *See Winkler*, 893 F.3d at 904 ("A private entity, such as [Corizon], that contracts to provide medical services at a jail can be held liable under § 1983 because it is carrying out a traditional state function.").  "Like a municipality, a government contractor cannot be held liable on a respondeat superior theory, but rather for a policy or custom of that private contractor."  *Id.* (quoting *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005)).

Corizon argues that even if Mr. Helvey was injured as a result of a Corizon employee's deliberate indifference, he cannot demonstrate that he was injured as a result of some unconstitutional policy, practice, or custom of Corizon itself.  [R. 62-1 at 12.]  Corizon specifically points out, as did Defendant Lexington-Fayette Urban County Government, that Corizon has no policy preventing its employees from treating opiate withdrawal with benzodiazepines.  *Id.* at 13.  Mr. Helvey does not contest this point, and it is therefore waived. What Mr. Helvey does argue, however, is that Corizon failed to train its employees on how to manage individuals going through opiate withdrawal.  [R. 87 at 46.]

---

[12] Because the failure to exhaust is an affirmative defense that was not raised by Corizon, the Court will proceed to analyze the merits of Corizon's *Monell* argument.

The Court finds that an issue of material fact exists in relation to "a policy or custom of failing to train and supervise its [employees]." *Shadrick v. Hopkins Cnty., Ky.*, 805 F.3d 724, 738 N.6 (6th Cir. 2015). Here, Corizon required its employees to complete certain training materials involving substance abuse withdrawal. [R. 87-8.] Furthermore, providers and nurses were required to review and complete a substance abuse withdrawal test on the materials within thirty days of beginning employment and a supervisor was required to review the test answers and put the test in that employee's personnel file. [R. 87 at 46.]

However, discovery revealed that only one of the individual defendants had the substance abuse withdrawal test in her personnel file, and a supervisor had not reviewed it with her. [R. 87-8 at 17–19.] Furthermore, none of the individual defendants recalled whether "the training materials they reviewed included information on withdrawal," and "there was no ongoing training program." [R. 87 at 46–47.] Given that the facility commonly encounters inmates at high risk of withdrawal, it is particularly important for the medical staff to have a baseline understanding of how to manage withdrawal symptoms. There is a question of material fact as to whether Corizon failed to equip its medical staff "with specific tools to handle recurring situations." *Ouza*, 969 F.3d at 287. Therefore, the Court denies summary judgment as to *Monell* liability for Corizon.

**4**

Mr. Helvey's fifth count is for negligence/gross negligence against the Medical Defendants. [R. 1 at 15.] In Kentucky, medical negligence "is nothing more than a subset of common law negligence" and requires "proof of the same fundamental elements—duty, breach, causation and damages." *Earle v. United States*, 2016 WL 1417811, at *4 (E.D. Ky. Apr. 11, 2016) (citing *Grubbs ex rel. Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682,

693–94 (Ky. 2003)).  "In most medical negligence cases, the plaintiff must present expert testimony establishing the standard of skill expected of a reasonably competent medical practitioner."  *Id.* at *2 (citing *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 212 (Ky. 2012)).  The testimony must establish "(1) the standard of skill expected of a reasonably competent medical practitioner and (2) that the alleged negligence proximately caused the injury."  *White v. Norton Healthcare, Inc.*, 435 S.W.3d 68, 76 (Ky. Ct. App. 2014) (*citing Meador v. Arnold*, 94 S.W.2d 626, 631 (Ky. 1936)).  The primary exception to the requirement of expert testimony is a situation in which "negligence is so apparent that a layperson would have no difficulty recognizing it."[13]  *Baptist Healthcare Systems, Inc. v. Miller*, 177 S.W.3d 676, 681 n.9 (Ky. 2005) (citing *Perkins v. Hausladen*, 828 S.W.2d 652, 655 (Ky. 1992)).

Mr. Helvey's expert Dr. Blondell specifically opined in his report that Mr. Helvey received substandard care from the medical staff at the Detention Center in the following ways: (1) he was not treated with a benzodiazepine or barbiturate once he started exhibiting early withdrawal symptoms; (2) his detox observations were ended early on March 31; (3) he was not urgently transported to the hospital after he was found hallucinating and unable to speak; and (4) a urine dipstick toxicology was not performed on him to further assess his risk.  [R. 87 at 39.] These alleged shortcomings can be attributed to Defendants Ms. Warner, Dr. Welling, Ms. Feltner, and Ms. Riley as discussed in section IIB1 supra.  For many of the same reasons discussed when addressing the deliberate indifference claim, there are genuine issues of material fact as to whether the actions of Defendants Ms. Warner, Dr. Welling, and Ms. Feltner, and Ms. Riley proximately caused Mr. Helvey's injuries.  Furthermore, even apart from the expert

---

[13] The other primary exception to the general rule requiring expert testimony "occurs when medical experts may provide a sufficient foundation for *res ipsa loquitur* on more complex matters."  *Earle*, 2016 WL 1417811, at *2 (quoting *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006)).  That exception is not applicable in this case.

testimony, a layperson likely would have little difficulty recognizing negligent behavior in not treating Mr. Helvey with a benzodiazepine once he started exhibiting early withdrawal symptoms, ending Mr. Helvey's detox observations early, and not urgently transporting Mr. Helvey to the hospital after he was found hallucinating and unable to speak.[14] Accordingly, the motion for summary judgment as to Defendants Ms. Warner, Dr. Welling, Ms. Feltner, and Ms. Riley will be denied.

However, the motion will be granted as to Defendants Ms. Franco, Ms. Miller, and Ms. Theobald.  In her Motion for Summary Judgment, Ms. Franco argues Mr. Helvey cannot demonstrate that she breached a standard of care.  [R. 55 at 4.]  Specifically, Ms. Franco argues that Mr. Helvey's expert failed to demonstrate that she was negligent.  *Id.* at 5.  Mr. Helvey responds by arguing that (1) she had a duty to communicate her observations to the medical staff but failed to do so; and (2) Mr. Helvey does not need expert testimony to establish that Ms. Franco breached her duty.  [R. 74 at 15, 23.]

Here, Mr. Helvey's expert testimony has failed to establish either the standard of care of a reasonably competent medical practitioner or that Ms. Franco's alleged negligence proximately caused the injury.  In his deposition, Dr. Blondell, Mr. Helvey's expert, stated that it was his understanding that Ms. Franco was "a mental health counselor and it's not part of what she does to be involved in the medical care of people going through withdrawal."  [R. 74-10 at 114.]  Although Dr. Blondell stated that if Ms. Franco saw someone hallucinating then she should "at the very least just notify somebody," he added that "if that's not in her job description, it's perfectly fine for her to ignore that."  *Id.* at 115.  Dr. Blondell also stated that his objection to

---

[14] However, a layperson likely would not readily recognize failing to perform a urine dipstick toxicology to assess Mr. Helvey's risk as negligent behavior.

Ms. Franco was "not on a professional doing a job but as another human being looking at another human being who's suffering." *Id.*

Here, Dr. Blondell's opinion is general and explicitly denies that his criticisms of Ms. Franco were in her professional capacity. [*See* R. 74-1 at 115.] While it may be true that human beings should look out for others who may be suffering, the expert testimony must establish "the standard of skill expected of a *reasonably competent medical practitioner*." *White*, 435 S.W.3d at 76 (emphasis added). Mr. Helvey's expert testimony fails to establish the standard of skill that is expected of a reasonably competent medical practitioner.

The Court also finds that the layperson exception does not apply in this case. For this exception to apply, the negligence has to be "so apparent that a layperson would have no difficulty recognizing it." *Miller*, 177 S.W.3d at 681 n.9. The actions at issue occurred on April 2, at 9:06 p.m. when Ms. Franco conducted a suicide observation of Mr. Helvey. [R. 62-12.] Ms. Franco observed that Mr. Helvey "wav[ed] his limbs and back[ed] away" when approached. *Id.* She also observed that his speech was "impoverished," though it appeared "as though he underst[ood]" what was being asked of him. *Id.* In her professional opinion, Ms. Franco ultimately concluded that Mr. Helvey was being uncooperative and she was "unable to fully assess speech and thought process for perceptual disturbance." *Id.*

With the benefit of hindsight, it is easier to see that Mr. Helvey was suffering from withdrawal symptoms. However, in her professional opinion and based upon her observations, Ms. Franco determined that Mr. Helvey was being uncooperative, not that he was suffering from withdrawal symptoms. It was reasonable for Ms. Franco to document her belief that Mr. Helvey was being uncooperative in her note rather than speak with a member of the medical staff in person. Therefore, it cannot be said that Ms. Franco's actions constituted negligence "so

apparent that a layperson would have no difficulty recognizing it." *Miller*, 177 S.W.3d at 681 n.9. Accordingly, summary judgment is proper as to Mr. Helvey's negligence claim against Ms. Franco.

In his report and deposition as to the remaining defendants, Dr. Blondell spoke of the medical staff at the Detention Center in general terms. He wrote in his report that it was his opinion that "[t]he medical staff appears to be objectively unreasonable, grossly incompetent and deliberately indifferent." [R. 63-2 at 5.] When asked during his deposition to attribute his particular criticisms to the Defendants, he replied, "I mean, I know that somebody dropped the ball, you're asking me who dropped the ball, and that's not what I was retained to perform an opinion on." [R. 74-10 at 103.] He further added when asked whether it was his opinion that the standard of care was breached but that he did not have an opinion on who breached it, he replied, "[c]orrect." *Id.* at 105.

An expert's opinion "must be based on reasonable medical probability and not speculation or possibility." *White*, 435 S.W.3d at 76 (quoting *Sakler v. Anesthesiology Associates, P.S.C.*, 50 S.W.3d 210, 213 (Ky. Ct. App. 2001)). Therefore, apart from the specific actions attributable to the defendants discussed above, Dr. Blondell's report is not helpful in parsing out the standard of skill expected of Defendants Ms. Miller and Ms. Theobald and whether their alleged negligence proximately caused Mr. Helvey's injuries. Therefore, the Court must determine whether Defendants Ms. Miller and Ms. Theobald's "negligence is so apparent that a layperson would have no difficulty recognizing it." *Miller*, 177 S.W.3d at 681 n.9. The classic example of this phenomenon is when a "surgeon leaves a foreign object in the body or removes or injuries an inappropriate part of the anatomy." *White*, 435 S.W.3d at 77.

In the briefing, Mr. Helvey fails to provide any basis for believing that Nurse Miller acted negligently.  The only time she is addressed by Mr. Helvey in briefing, other than to briefly mention that Ms. Miller observed Mr. Helvey and took his vital signs on March 29 and March 30, is to argue that she acted unreasonably in relying on jail officers to conduct detox observations.  [R. 87 at 28.]  However, as previously discussed, the act of entering orders instructing officers to observe for withdrawal symptoms is not negligent.  Accordingly, the motion for summary judgment as to Ms. Miller will be granted.

Mr. Helvey's only issue with Ms. Theobald is that she was the first nurse to have the chance to conduct a urine dipstick toxicology.  However, while Dr. Blondell did opine that a general failure to perform a urine dipstick toxicology to further assess his risk contributed to Mr. Helvey receiving substandard care, Dr. Blondell did not attribute this shortcoming specifically to Ms. Theobald.  Furthermore, although Ms. "Theobald had the first chance" to conduct a urine dipstick toxicology, nothing in the record indicates this was ultimately her responsibility or that Ms. Theobald's negligence in failing to conduct the urine dipstick toxicology constitutes negligence that "is so apparent that a layperson would have no difficulty recognizing it." *Miller*, 177 S.W.3d at 681 n.9.  Accordingly, the Court grants summary judgment as to Ms. Theobald's negligence/gross negligence claim.

**5**

The sixth count is for negligence/gross negligence against Defendants Haney, Corizon Health, Inc., and Corizon, LLC.  [R. 1 at 16.]  "The law imposes the duty on a jailer to exercise reasonable and ordinary care and diligence to prevent unlawful injury to a prisoner placed in his custody, but he cannot be charged with negligence in failing to prevent what he could not reasonably anticipate." *Hedgepath*, 520 F. App'x at 389 (quoting *Lamb v. Clark*, 138 S.W.2d

350, 352 (1940)). "Qualified immunity under Kentucky law shields public employees from tort liability so long as the employee was performing '(1) discretionary acts or functions ...; (2) in good faith; and (3) within the scope of the employee's authority.'" *Hedgepath*, 520 F. App'x at 389 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)); *see also Browning v. Edmonson Cnty., Ky.*, 18 F.4th 516, 531 (6th Cir. 2021). However, an employee is not entitled to immunity "from tort liability for the negligent performance of a ministerial act, *i.e.*, one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Yanero*, 65 S.W.3d at 522.

It is well-settled Kentucky law that "although a supervisor's decision 'on the content of policies and training is a discretionary function, the training of employees to adhere to their duties once that content is decided is a ministerial function." *Finn v. Warren Cnty., Ky.*, 768 F.3d 441, 449 (quoting *Hedgepath*, 520 F. App'x at 391). Furthermore, "the supervision of employees is a ministerial act when it merely involved enforcing known policies.'" *Id.* (quoting *Hedgepath*, 520 F. App'x at 391).

### a

Mr. Haney argues that he is protected by qualified immunity. Mr. Helvey argues that Mr. Haney "had a ministerial duty to enforce the settled rule requiring documented observations of inmates at risk for suicide or in a detox cell and the settled ME policy." [R. 82 at 19.] Mr. Helvey points to *Hedgepath v. Pelphrey* for the proposition that supervisory jailers have a ministerial duty to train jailers on how to comply with a policy mandating observation every twenty minutes for intoxicated prisoners. 520 F. App'x at 391–92. This policy also applies to prisoners who are suicidal or in a detox cell. *See* 501 Ky. Admin. Regs. 3:060 § 2(3). The "ME

policy" Mr. Helvey refers to is Lexington-Fayette County Detention Center Order Number 8.1-3, titled "Medical Emergencies." [R. 82-3.]  The policy outlines the Detention Center's medical emergency policies, including the general medical responsibilities of all staff.  *Id.* at 2.  The policy provides that all staff are responsible for ensuring that they contact medical staff as soon as possible if an inmate needs medical attention.[15]  *Id.*

Mr. Haney perfunctorily argues that "the Plaintiff has failed to show any act or omission by Director Haney that led to his injuries."  [R. 52.]  However, although a warden is higher up the food chain than the supervisory jailers at issue in *Hedgepath*, the fact remains that Director Haney understood his job to include "overseeing what was going on inside the Fayette County Detention Center."  [R. 82-2 at 4.]  This would certainly include making sure that the Detention Center was following Kentucky Administrative Regulations.  Jail personnel in Kentucky, which includes those within the Fayette County Detention Center, are required to "conduct and document direct in-person surveillance…at least every twenty minutes" on prisoners who are suicidal, mentally or emotionally disturbed, or in a detox cell.  501 Ky. Admin. Regs. 3:060 § 2(3).  However, no medical professional at the Detention Center saw documentation of officer observations and they could not confirm whether the officers ever documented their observations.  [R. 82 at 3.]

"[T]he supervision of employees is a ministerial act when it merely involves enforcing known policies."  *Hedgepath*, 520 F. App'x at 392 (citing *Yanero*, 65 S.W.3d at 522).  That means that Director Haney is not entitled to qualified immunity, and there is a genuine issue of material fact as to whether he negligently supervised his officers.  Accordingly, the Court finds

---

[15] In the Complaint, Mr. Helvey also avers that the Detention Center, Corizon, and Defendant Haney had a policy "that neither they nor their employees or independent contractors would provide Detention Center inmates benzodiazepines."  [R. 1 at 8.]  However, as previously discussed, discovery revealed that this was not true and therefore does not merit further discussion.

that Director Haney is not entitled to summary judgment as to the count of negligence/gross negligence.

**b**

The Corizon Defendants argue that they are entitled to summary judgment on the negligence/gross negligence claim.  [R. 65-1.]  "Kentucky law recognizes that an employer can be held liable for the negligent supervision of its employees."  *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003) (citing *Smith v. Isaacs*, 777 S.W.2d 912, 914 (Ky. 1989)).  "Kentucky has adopted the Restatement (Second) of Agency § 213 which" provides that "an employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created.  *Id.* (citing Restatement (Second) of Agency § 213 (1958) (Comment & Illustrations)); *see also Jackson v. Steele*, 2014 WL 2801337, at *13 (E.D. Ky. June 19, 2014).

The Corizon Defendants argue that because Dr. Blondell, Mr. Helvey's expert, failed to specifically criticize Corizon's training or supervision of its employees, no expert has criticized Corizon's policies and procedures and Corizon is therefore entitled to summary judgment.  *Id.* at 5.  In response, Mr. Helvey argues that Dr. Blondell did opine that individual defendants (employees of Corizon) were not appropriately trained in the assessment and monitoring of benzodiazepine withdrawal symptoms.  [R. 87 at 49.]  Mr. Helvey also argues that the failures in training "were a substantial factor in causing Helvey's injuries."  *Id.*

The Court finds that Mr. Helvey's argument are persuasive.  Just as Director Haney had a responsibility to ensure that established policies were carried out, Corizon had a responsibility to ensure that policies related to withdrawal symptom training were followed.  Corizon failed to ensure that its medical staff at the Detention Center had even a basic understanding of managing

withdrawal symptoms, and there is a question as to whether Corizon had reason to know of the
substantial risk that their failure to train caused. Accordingly, the Court denies summary
judgment to the Corizon defendants as to the negligence/gross negligence claim.

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as
follows:

1. Defendants Mr. Haney and Lexington-Fayette Urban County Government's Motion for
   Summary Judgment **[R. 52]** is **GRANTED IN PART** and **DENIED IN PART** as
   follows:

   a. Summary judgment as to Mr. Haney is **GRANTED** as to Counts Three and Four
   and **DENIED** as to Count Six

   b. Summary judgment as to Lexington-Fayette Urban County Government is
   **GRANTED**;

2. All claims against Defendant Heather Lakes are considered **ABANDONED** and
   Defendant Heather Lakes' Motion for Summary Judgment **[R. 54]** is **GRANTED**;

3. Defendant Maryann Franco's Motion for Summary Judgment **[R. 55]** is **GRANTED**;

4. Corizon Defendants' first Partial Motion for Summary Judgment **[R. 62]** is **GRANTED
   IN PART** and **DENIED IN PART** as follows:

   a. Summary judgment as to Michelle Welling, Patricia Warner, Mary Theobald,
   Connie Miller, Rhonda Feltner, and Mary Riley is **GRANTED** as to Count One;

   b. Summary judgment as to Mary Theobald, Connie Miller, and Mary Riley is
   **GRANTED** as to Count Two

      c.  Summary judgment as to Michelle Welling, Patricia Warner, and Rhonda Feltner is **DENIED** as to Count Two;

      d.  Summary judgment as to Corizon Health, Inc., and Corizon, LLC is **DENIED** as to Count Four;

5. Corizon Defendants' second and fourth Motions for Summary Judgment **[R. 64; R. 66]** are **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.  Summary judgment as to Connie Miller and Mary Theobald is **GRANTED** as to Count Five;

      b.  Summary judgment as to Michelle Welling, Patricia Warner, Rhonda Feltner, and Mary Riley is **DENIED** as to Count Five;

6. Corizon Defendants' third Motion for Summary Judgment **[R. 65]** is **DENIED** insofar as it seeks to dismiss Count Six and Count Seven of the Indictment;

7. Count One of the Indictment is **DISMISSED**;

8. Count Three of the Indictment is considered **ABANDONED** as to Defendants Michelle Welling and Patricia Warner and Count Three is accordingly **DISMISSED**;

9. Plaintiff Chase Helvey's Motion for Leave to File Excess Pages **[R. 88]** is **GRANTED**; and

10. With no claims remaining against them, Defendants Lexington-Fayette Urban County Government, Heather Lakes, Maryann Franco, Connie Miller, and Mary Theobald are **DISMISSED** from this action.

This the 24th day of January, 2022.

Gregory F. Van Tatenhove
United States District Judge